# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| **ADAM PEGUES,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 16-239-SMY-RJD** |
| | ) | |
| **JOHN COE, et al.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

# MEMORANDUM AND ORDER

**YANDLE, District Judge:**

Plaintiff Adam Pegues, an inmate in the custody of the Illinois Department of Corrections ("IDOC"), filed this lawsuit pursuant to 42 U.S.C. § 1983, alleging that his constitutional rights were violated while he was incarcerated at Lawrence Correctional Center ("Lawrence"). Specifically, Plaintiff alleges Defendants failed to comply with the Americans with Disabilities Act ("ADA") and were deliberately indifferent to his serious medical needs. Following threshold review, Plaintiff proceeds on the following claims:

**Count 1:** Eighth Amendment deliberate indifference claim against Defendant Duncan, for ignoring Plaintiff's request for help in obtaining medical care;

**Count 2:** Eighth Amendment deliberate indifference claim against Defendants Coe, and Kimmel, for denying or delaying medical care to Plaintiff;

**Count 3:** Eighth Amendment deliberate indifference claim against Wexford Health Sources, for maintaining policies that resulted in the denial and/or delay of medical care to Plaintiff;

**Count 4:** Claims under the ADA and Rehabilitation Act against Director Baldwin (official capacity only), for denial of accommodations such as a wheelchair attendant, showers, and access to gym and physical therapy.

This matter is currently before the Court on the Motion for Summary Judgment filed by Defendants Duncan and Baldwin (Doc. 129) and the Motion for Summary Judgment filed by

Defendants Coe, Kimmel and Wexford (Doc. 131).  Plaintiff filed a Response to each motion (Docs. 137, 138).  Defendants Coe, Kimmel and Wexford filed a Reply to Plaintiff's Supplemental Statement of Material Facts (Doc. 139).  For the following reasons, Defendants' motions are **GRANTED**.

### Material Facts

1. Adam Pegues was transferred to Lawrence in March 2014 (Plaintiff's Deposition, Doc. 130-2 at 6).

2. Defendant Dr. John Coe is a medical doctor who served as the Medical Director at Lawrence from 2013 to July 31, 2016, as an employee of Wexford Health Sources, Inc. (Deposition of Dr. John Coe, Doc. 132-2).

3. Defendant Tammy Kimmel was a licensed practical nurse at Lawrence and an employee of Wexford Health Sources Inc., during the material time period referenced in Plaintiff's Complaint (Deposition of Tammy Kimmel, Doc. 132-3).

4. Wexford Health Sources, Inc. entered into a contract with IDOC to provide medical services to IDOC inmates, including Lawrence (Doc. 1).

5. Defendant Duncan was the warden at Lawrence and is not a medical professional (130-1 at 1).

6. Pegues complained of non-specific abdominal pain prior to his transfer to Lawrence (Doc. 130-2 at 11).

7. An x-ray and sonogram of his abdomen performed prior to his arrival at Lawrence were normal (Id.).

8. Pegues alleges that he spoke to Defendant Duncan about being in pain on March 22, 2014.  Pegues told Duncan "about the blood in the stool and the stomach pains I was

having and it is hard to eat and stuff like that, and I told him I need medical attention, could he get me some medical attention" (Id at 45).

9. Pegues received medical treatment on March 24, 2014; two days after he alleges that he spoke to Warden Duncan. He was seen in the Health Care Unit ("HCU") and was referred to see Dr. Coe (Plaintiff's Medical Records, Doc. 130-3 at 2).

10. Dr. Coe saw Pegues for the first time on March 25, 2014 for complaints of abdominal pain (Id. at 1).

11. On March 25, 2014, Pegues' abdomen was tender to deep palpation. Dr. Coe prescribed Enulose and Fiberlax (both laxatives), and scheduled Pegues for a return visit in one week for further evaluation (Id.).

12. When Pegues returned on April 1, 2014, he reported that his stools had not loosened. Dr. Coe again reviewed Plaintiff's prior records, including the February 2014 sonogram report (Id at 3).

13. Dr. Coe planned to admit Pegues to the infirmary when possible to evaluate for blood in his stool (Id.).

14. On May 15, 2014, Dr. Coe reviewed Pegues' most recent lab results, which were normal, and asked that Pegues be scheduled for a visit in the HCU so that he could discuss the results with him (Doc. 93-4 at 2).

15. Dr. Coe discussed Pegues' lab results with him on May 20, 2014, and scheduled him for another visit in one week. On May 28, Dr. Coe noted normal bowel sounds with some tenderness in Pegues' left mid to lower abdomen. He added Bentyl, a drug designed to treat bowel spasms/Irritable Bowel Syndrome, to Pegues' medication regimen. Dr. Coe scheduled him to return in two weeks (Id. at 2-3).

16. On June 5, 2014, Pegues requested additional testing be performed. Dr. Coe explained that further testing was not clinically indicated until he had completed further evaluation (Id.).

17. On June 7, 2014, Pegues returned to the HCU complaining of abdominal pain. He stated, "no one will help me" and reported that he had a bowel movement earlier that day that was hard as a brick (Affidavit of Sherry Collins, LPN, Doc. 93-2 at 1).

18. Pegues stated that "no one was doing their jobs" and that "no one was taking him seriously" but would do so when he was dead. Nurse Collins noted a recent visit with Dr. Coe on June 5, 2014 and scheduled Pegues for a visit with the doctor. (Id. at 1-2).

19. Pegues was admitted to the infirmary on June 20, 2014. On admission, Dr. Coe performed a complete physical exam. A rectal exam was negative for blood. Dr. Coe added nortriptyline (Pamelor), an antidepressant, and Tylenol to Pegues' medication regimen, and ordered inspection of his stools to check for blood (Doc. 93-4 at 3).

20. During Pegues' admission to the infirmary from June 20-23, 2014, his stool was regularly checked for blood, each time with a negative finding (Doc. 93-2 at 2).

21. Nurse Collins saw Pegues in the infirmary on June 22, 2014. His abdomen was soft and not distended. Pegues was able to eat his entire lunch tray, walk around his cell normally and sit upright to read a book, despite rating his pain at 8/10 (Id.).

22. Dr. Coe discharged Pegues from the infirmary with continued prescriptions for Enulose, Fiberlax, Tylenol and Pamelor (Doc. 93-4 at 3).

23. Dr. Coe saw Pegues again on July 17, 2014. He complained that the Pamelor caused headaches and nausea, and that the Bentyl was ineffective. Pegues requested a wheelchair, but Dr. Coe declined the request due to the observations of medical and prison staff members that Pegues was able to walk normally. Pegues disputes that he was

able to walk normally. Dr. Coe continued Pegues' prescription for Enulose, and scheduled him to be followed in the General Medicine Clinic (Id. at 3-4).

24. On August 6, 2014, Pegues returned to the HCU complaining of pain with urination. Dr. Coe performed a physical exam, which was normal except for the same mild tenderness in Pegues' left lower quadrant. A urinalysis was negative for blood or any other objective finding consistent with Pegues' subjective complaints (Id. at 4).

25. When Dr. Coe next saw Pegues on September 17, 2014, he continued to complain of abdominal pain. His bowel sounds were normal. Pegues also complained of generalized back pain and an inability to walk. Dr. Coe performed a complete neurological exam, which was completely normal. Pegues' lab results demonstrated that he had high cholesterol, so Dr. Coe prescribed Simvastatin and continued all other orders (Id.).

26. Dr. Coe next saw Pegues on November 5, 2014. He had complained to the nurse of pain in his back, abdomen and penis, and asked for a wheelchair because it hurt to walk. Dr. Coe performed another physical exam, and found some mild tenderness in Pegues' lower back, but Pegues denied abdominal tenderness. Dr. Coe scheduled Pegues for labs in February 2015 and a follow-up visit in March 2015 (Id.).

27. Pegues was seen by the nursing staff in sick call on November 12, 1014, November 23, 2014, and December 3, 2014 with complaints of generalized pain (Id.).

28. On December 12, 2014, Dr. Coe saw Pegues for his continued complaints. A physical exam was again normal. Dr. Coe ordered a series of lab tests and scheduled a return visit thereafter (Id. at 4-5).

29. When Pegues returned on January 26, 2015, Dr. Coe noted that his urinalysis was positive for a small amount of blood and protein, with a slightly elevated sedimentation

rate and an elevated creatinine value. Dr. Coe ordered a follow-up urinalysis and culture and other lab tests to further evaluate (Id. at 5).

30. At that time, Dr. Coe noted that Pegues' continued complaints of pain so severe that he could barely walk did not match his clinical findings (Id.).

31. Dr. Coe reviewed the chart and the most recent labs on February 16, 2015. The labs had all returned to normal except for continued bilirubin elevation, which had been chronically slightly elevated. Dr. Coe diagnosed Pegues with Gilbert's syndrome, a common, harmless liver condition in which the liver does not properly process bilirubin (Id.).

32. Pegues returned to the HCU on February 18, 2015. At that time, Dr. Coe was aware of Nurse Sherry Collins' recent note that she observed Pegues walking down the hallway carrying a bag from the commissary without any difficulty (Id.).

33. Dr. Coe concluded that Pegues' subjective complaints of pain in his back, penis and abdomen were inconsistent with his physical examinations, including the one performed on February 18, and serial lab tests (Id.).

34. Dr. Coe scheduled Pegues to be seen in the General Medicine Clinic (Id.).

35. Pegues reported seeing blood in his urine on February 26, 2015. A urinalysis performed that day was negative for blood (Id.).

36. Plaintiff continued to make complaints of back and abdominal pain in addition to complaints of chest pain on March 23, 2015. Dr. Coe ordered labs and x-rays of Pegues' thoracic and lumbar spine (Id)

37. The lab tests showed a mildly low vitamin D level. Dr. Coe ordered a vitamin supplement (Id. at 6).

38. X-rays of Pegues' thoracic and lumbar spine demonstrated mild narrowing of the disc space at L5-S1 (Id.).

39. Pegues was seen on sick call on April 21, 2015 with the same set of complaints. He was provided antacid tabs for his chest pain and Ibuprofen and a cold pack for his back pain (Id.).

40. Dr. Coe again saw Pegues on May 6, 2015. He continued to make complaints of abdominal and back pain. He had normal bowel sounds and a soft abdomen. Pegues' back showed no objective signs of abnormality or injury, and he would hold his back rigid only while being examined (Id.).

41. On October 16, 2015, Dr. Coe reviewed the results of an abdominal x-ray which was normal. Pegues continued to complain about back pain, but Dr. Coe's physical exam was normal (Id.).

42. On October 19, 2015, Pegues reported that he fell down a flight of stairs after his legs "gave out" and that he hurt his back, legs, head and neck. He was transported to the HCU on a stretcher and was sent to the emergency room at an outside hospital for further evaluation (Id.).

43. Dr. Coe saw Pegues on October 20, 2015 when he returned from the hospital. Dr. Coe's assessment was that Pegues' reflexes and muscle tone continued to be normal, and he was able to crawl around on the ground. Dr. Coe ordered that Pegues could have a low gallery and low bunk permit and that he was not to be on steps. He also requested a psychiatric consultation to evaluate Pegues for self-harm (Id. at 6-7).

44. Pegues was seen crawling to use the bathroom on October 20, 2015 (Doc. 137-1 at 49).

45. On November 5, 2015, Pegues was brought to the HCU by members of the guard staff from segregation because he was unable to walk and was complaining of back pain and

leg numbness. A physical exam was essentially normal except for some tenderness in Pegues' low back and hyper-reflexivity of his legs. Dr. Coe admitted Pegues to the infirmary, ordered a lumbar spine x-ray and ordered a wheelchair for Pegues (Doc. 93-4 at 7).

46. The lumbar x-ray revealed the same mild narrowing of the disc space at L5-S1 and minimal narrowing at L4-L5 (Id.).

47. Dr. Coe discharged Pegues from the infirmary on November 5, 2015 with an order for a wheelchair for three weeks (Id.).

48. Pegues returned as scheduled on November 12, 2015. He continued to state that he could not walk, but had brisk reflexes in his legs and an absent Babinski sign (Id.).

49. Dr. Coe requested a collegial review of Pegues' case to obtain the thoughts of other providers as to how to proceed (Id.).

50. The collegial review occurred on November 17, 2015. A physical therapy consultation was ordered, with the focus on the objective findings rather than Pegues' subjective complaints (Id.).

51. Dr. Coe again saw Pegues on December 15, 2015. He continued to complain of an inability to walk, back pain and abdominal pain. His abdomen was non-tender with normal bowel sounds, and Dr. Coe was unable to elicit pain with palpation on Pegues' back (Id. at 8).

52. On February 12, 2016, Pegues stated he was unable to get out of his wheelchair. He complained of blood in his urine, chest pain, abdominal pain, back pain and bowel problems. Dr. Coe's physical exam was once again normal. He ordered a series of lab tests, and provided Pegues with a wheelchair cushion to prevent skin problems as he

refused to get out of his wheelchair (Id.).  Plaintiff disputes that he refused to get out of his wheelchair.

53. The physical therapy consultation took place on March 2, 2016.  On March 9, 2016, Therapist Emily Thomann and Dr. Coe went over her findings and recommendation that Pegues not receive further physical therapy because his subjective complaints were inconsistent with Ms. Thomann's objective findings.  For example, Pegues claimed that he could not move his arms, but was able to hold a door open for Ms. Thomann (Id).  Plaintiff disputes that he was exaggerating his symptoms.

54. On March 30, 2016, Dr. Coe and Pegues discussed the findings of the physical therapist and Dr. Coe's recommendation that Pegues' wheelchair be taken away.  Pegues continued to claim that he could not use his legs, but muscle use in his right leg was observed when he was removed from his wheelchair (Id.).

55. On April 5, 2016, Pegues was observed crawling to the light switch in his cell (Doc. 137-1 at 55).

56. On April 10, 2016, Pegues came to the HCU complaining of abdominal and spinal pain.  He refused to stand so that Nurse Collins could perform a full physical examination, but despite grimacing with every movement, had good upper body strength.  IDOC staff reported that Pegues was eating well despite his ongoing complaints of abdominal pain.  Nurse Collins advised Pegues to return to the HCU if his complaints worsened (Doc. 93-2 at 3).  Plaintiff disputes that he refused to stand.

57. Dr. Coe again saw Pegues on April 28, 2016.  He continued to complain of paralysis.  His reflexes were very brisk, and he reported no abdominal tenderness.  Dr. Coe again ordered a series of labs and a follow-up visit in the General Medicine Clinic (Doc. 93-4 at 8).

58. Pegues was admitted to the infirmary on May 11, 2016 and observed closely by the nursing staff (Id.).

59. Dr. Coe ordered another physical therapy consultation, which was performed on May 25, 2016. Ms. Thomann again recommended that Pegues not receive therapy because of inconsistencies between his subjective complaints and Ms. Thomann's objective findings (Id. at 9).

60. Nurse Collins saw Pegues again on June 17, 2016 for complaints of abdominal pain. His abdomen was soft and non-distended with normal bowel sounds. Collins provided Pegues with heartburn medication. Pegues also made continued complaints about pain, numbness and tingling (Doc. 93-2 at 4).

61. Dr. Coe went over the physical therapist's report with Pegues on June 14, 2016. Pegues continued to have muscle tone and reflexes in his legs (Doc. 93-4 at 9).

62. Dr. Coe saw Pegues for the last time on July 26, 2016. He complained of blood in his urine and stool. Dr. Coe did not find these reports consistent with the overall clinical picture. He referred Pegues back to the General Medicine Clinic (Id.).

63. On November 19, 2016, Dr. Vipin Shah saw Pegues in the clinic at Lawrence. Pegues reported abdominal pain and seeing blood in his urine and stool. On physical exam, Pegues' abdomen was soft and non-tender (Doc. 93-7 at 1).

64. Dr. Shah ordered a series of lab tests and x-rays to investigate Pegues' subjective complaints and scheduled him to return so that he could go over the tests with him (Id.).

65. Pegues' CMP and urinalysis demonstrated that he was dehydrated, with blood in his urine due to mild kidney dysfunction secondary to dehydration. His abdominal x-ray was completely normal (Id.). Viewed together, Pegues' lab results and abdominal x-ray clinically indicated that he was dehydrated (Id. at 2).

66. On December 1, 2016, Pegues returned to the clinic to discuss his test results. Dr. Shah explained that he was dehydrated and needed to increase his water intake, which would help with the dehydration, movement of his stool and alleviate some of his subjective complaints of abdominal pain. Dr. Shaw ordered another set of lab tests (Id.).

67. On December 4, 2016, Pegues returned to the HCU with complaints of abdominal pain and Dr. Shah admitted him to the infirmary (Id.). On admission, Pegues complained of blood in his stool. Dr. Shah examined his abdomen, which continued to be soft and non-tender with normal bowel sounds (Id.).

68. On December 5, 2016, Pegues' abdomen was still soft and non-tender with normal bowel sounds (Id.). He was able to eat 80% of his lunch, despite complaining of severe abdominal pain (Doc. 93-2 at 4).

69. While in the infirmary, Pegues reported blood in his stool and urine, but flushed the toilet every time Nurse Collins asked to observe the blood. Pegues was able to eat all of his lunch and to climb in and out of his wheelchair (Id.). Pegues denies that he was intentionally uncooperative with Nurse Collins.

70. Dr. Shah spoke with Pegues again on December 6, 2016 and informed him that his labs were within normal limits and his urine and stool were negative for blood (Doc. 93-7 at 2). Pegues asked Dr. Shah to test his spine due to back pain and an inability to walk. Dr. Shah looked back in his chart, saw that radiological tests from March and November 2015, when he made the same complaints, did not indicate any condition severe enough to cause him to be unable to walk, and informed Pegues that he did not need the tests he was requesting (Id.). Pegues disputes that the tests were not needed.

71. On December 7, 2016, after Pegues' labs no longer indicated dehydration with associated hematuria, he was discharged from the infirmary. While in the infirmary, Pegues flushed his stool before the nursing staff could inspect it for blood (Id. at 3).

72. Dr. Shah next saw Pegues on January 24, 2017. He went over his most recent labs from late December 2016, which were completely normal. A urine culture was negative (Id.).

73. Dr. Shah asked if Pegues had been drinking more water as recommended, to which he replied, "It is your job to find out why." Dr. Shah advised Pegues to be more cooperative and again, to drink more water (Id.).

74. Another set of thoracic and cervical spine x-rays were taken on February 28, 2017 which Dr. Shah assessed as being completely normal (Id.). Plaintiff disputes that an x-ray showing disc narrowing is "completely normal."

75. Pegues was granted a permit for the ADA gym in April 2017 (Doc. 130-3 at 46).
    Dr. Shah saw Pegues again on May 18, 2017. His abdomen was soft and non-tender with normal bowel sounds (Doc. 93-7 at 3).

76. On July 7, 2017, Dr. Faiysal Ahmed, a temporary physician at Lawrence, completed a Medical Special Services Referral and Report form regarding Pegues (Doc 132-4 at 3-4). He requested approval to refer Pegues to a neurologist for evaluation (Id.).

77. The Utilization Management program employed by Wexford utilizes a process called Collegial Review. The Collegial Review process's primary purpose is to ensure that all patients receive medically necessary and appropriate care at the appropriate level of service. If a patient requires offsite medical consultation or specialized onsite/offsite medical testing, the case is presented at Wexford Collegial Review (Id. at 2-3).
    On July 19, 2017, Dr. Neil Fisher served as the Utilization Management Physician and participated in a collegial review conference call with Dr. Ahmed regarding his referral.

The referral to an offsite neurologist was not approved due to "insufficient information" (Id. at 4).

78. In an affidavit, Dr. Fisher attested that Dr. Ahmed was unfamiliar with Plaintiff's medical history and had just recently started working at Lawrence Correctional Center (Id.).

79. Dr. Ahmed agreed to review Plaintiff's medical history, to reevaluate Plaintiff, and to resubmit the request if appropriate.

80. Pegues continues to report severe pain in his back and spine, and now utilizes a wheelchair at all times (132-1 at 52).

81. Although Pegues has requested a wheelchair attendant and access to additional showers due to his disability, he has not been granted either accommodation (130-2 at 50-51).

## Discussion

Summary judgment is appropriate only if the moving party can demonstrate "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322(1986); *see also Ruffin-Thompkins v. Experian Information Solutions, Inc.*, 422 F.3d 603, 607 (7th Cir. 2005). The moving party bears the initial burden of demonstrating the lack of any genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once a properly supported motion for summary judgment is made, the adverse party "must set forth specific facts showing there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Estate of Simpson v. Gorbett*, 863 F.3d 740, 745 (7th Cir. 2017) (quoting *Anderson*, 477 U.S. at 248). When deciding a summary judgment motion, the Court views the facts in the light most favorable to, and draws all reasonable inferences in favor of, the nonmoving party. *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 735 F.3d 962, 965 (7th Cir. 2013) (citation omitted).

## Deliberate Indifference

The Eighth Amendment protects inmates from cruel and unusual punishment. U.S. Const., amend. VIII; *see also Berry v. Peterman*, 604 F.3d 435 (7th Cir. 2010). As the Supreme Court has recognized, "deliberate indifference to serious medical needs of prisoners" may constitute cruel and unusual punishment under the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). In order to prevail on such a claim, the plaintiff must first show that his condition was "objectively, sufficiently serious" and second, that the "prison officials acted with a sufficiently culpable state of mind." *Greeno v. Daley*, 414 F.3d 645, 652-53 (7th Cir. 2005) (citations and quotation marks omitted).

The following circumstances are indicative of an objectively serious condition: "[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Hayes v. Snyder*, 546 F.3d 516, 522-23 (7th Cir. 2008) (quoting *Gutierrez v. Peters*, 111 F.3d 1364, 1373 (7th Cir. 1997)); *see also Foelker v. Outagamie Cnty.*, 394 F.3d 510, 512-13 (7th Cir. 2005) ("A serious medical need is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.").

An inmate must also show that prison officials acted with a sufficiently culpable state of mind, namely deliberate indifference. Put another way, the plaintiff must demonstrate that the officials were "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists" and that the officials actually drew that inference. *Greeno*, 414 F.3d at 653. A plaintiff does not have to prove that his complaints were "literally ignored," but only that "the defendants' responses were so plainly inappropriate as to permit the inference that the defendants intentionally or recklessly disregarded his needs." *Hayes*, 546 F.3d at 524 (quoting *Sherrod v.*

*Lingle*, 223 F.3d 605, 611 (7th Cir. 2000)). Negligence, gross negligence, or even recklessness as that term is used in tort cases, is not enough. *Id.* at 653; *Shockley v. Jones*, 823, F.2d 1068, 1072 (7th Cir. 1987). Also, "mere disagreement with the course of the inmate's medical treatment does not constitute an Eighth Amendment claim of deliberate indifference. *Snipes v. DeTella*, 95 F.3d 586, 591 (7th Cir. 1996).

Warden Duncan argues he did not have sufficient personal involvement and that he was not deliberately indifferent to Plaintiff's medical needs. Pegues argues that he personally communicated with Warden Duncan regarding his medical needs when he first arrived at Lawrence and that Duncan allowed his medical needs to continually be ignored by medical staff at Lawrence. Specifically, Pegues alleges that he spoke to Duncan about his stomach pain and medical complaints on March 22, 2014. According to Pegues' medical records, he was seen by medical staff at Lawrence on March 24, 2014 and then by Dr. Coe on March 25, 2014. Following his visit to the HCU on March 24, 2014, Pegues has continually been under the treatment of numerous medical professionals at Lawrence.

If an inmate is under the care of medical experts, a non-medical prison official will generally be justified in believing that the inmate is in capable hands. *Arnett v. Webster*, 658 F.3d 742, 755 (7th Cir. 2011). Following his conversation with Duncan on March 22, 2014, Pegues was seen by the HCU within two days. There is no evidence that Duncan ignored Pegues' complaints on March 22, 2014. Pegues maintains that as Warden, Duncan should have ensured that his medical needs did not go untreated. However, there is no evidence that he had any further conversations with the Duncan about his medical treatment after March 22, 2014. Given that Pegues was under the care of medical professionals after March 24, 2014, Duncan was justified in relying on the medical staff to treat Pegues' medical conditions. Because Pegues has failed to produce sufficient evidence to show that Defendant Duncan acted with deliberate

indifference to his medical needs,[1]  Duncan is entitled to summary judgment as to Count 1.

Defendants Coe and Kimmel assert that it is questionable whether Pegues has a "serious medical need."  In support of their argument, Defendants point to numerous differences between the objective medical evidence and Pegues' subjective complaints, both while under their care and under the care of other medical professionals.  Defendants also argue that even giving Pegues the benefit of the doubt, and assuming he was experiencing abdominal and/or back pain, the facts fail to demonstrate that they acted with deliberate indifference.

Pegues contends that his consistent complaints of pain in his back, spine and gastrointestinal system for over three years are enough to demonstrate a serious medical need. He points out that at times, his pain so severely affected his mobility that he was forced to crawl on the floor of his cell.  He argues that Dr. Coe has been deliberately indifferent to his serious medical needs because not only has he failed to offer reasonable treatment, he failed to even diagnose his condition.  He further argues that Coe's failure to refer him to specific types of specialists[2] is, in and of itself, sufficient for a jury to conclude that Dr. Coe was deliberately indifferent.

Viewing the facts in the light most favorable to Pegues, the Court finds that Pegues' ongoing subjective complaints of pain are sufficient to establish an objectively serious medical need.  However, Plaintiff's assertions of deliberate indifference by Dr. Coe are not supported by the record in this case.  In order to diagnose and find an objective basis for Pegues' subjective complaints, Dr. Coe ordered multiple sets of lab tests, physical examinations, observations, sonograms, and x-rays.  He prescribed medication for bowel spasms, multiple laxatives, pain medication, vitamin supplements, antacids, and anti-depressants in an attempt to treat Pegues'

---

[1] Defendant Duncan also asserts that he is entitled to qualified immunity on Pegues' claims.  Because the Court has concluded that the evidence does not create a genuine issue of material fact as to whether Defendant Duncan violated Pegues' Eighth Amendment rights, it will not address the issue of qualified immunity.

[2] Plaintiff testified in his deposition he should have been referred to an urologist (Defendants' attorney clarified that perhaps he meant a gastroenterologist) for his stomach pain and a neurologist for his back pain.

condition and pain. Dr. Coe also referred Pegues to be seen in the General Medicine Clinic multiple times and admitted him to the infirmary for observation on at least three occasions.

Additionally, the evidence does not support Pegues' assertion that Dr. Coe refused to refer him to a specialist. When the objective tests came back negative[3] and the subjective complaints continued, Dr. Coe ordered a collegial review of Pegues' complaint in November 2015. The collegial review recommended that Dr. Coe refer Pegues to a physical therapist for assessment. Dr. Coe did so and the consultation occurred in March 2016. Dr. Coe then ordered a second physical therapy consult in May 2016. Plaintiff may disagree with Dr. Coe's findings and the findings of the collegial review and physical therapy consult, but disagreement with the course of his treatment does not support a viable Eighth Amendment deliberate indifference claim.

Pegues also argues that Dr. Coe was deliberately indifferent when he delayed providing him with a wheelchair. This portion of the deliberate indifference claim also directly relates to Nurse Kimmel.[4] While Pegues' complaints of abdominal pain and back pain were sufficient to show a serious need for medical assessment and treatment, he must show a serious medical need for a wheelchair. In that regard, his claim that he could not walk at times due to severe pain, supported by statements in the record, is enough to raise a genuine issue of fact regarding his serious medical need for a wheelchair. The issue of fact will not be material, or outcome determinative, however, unless there is also a genuine issue of material fact as to whether Dr. Coe and/or Nurse Kimmel acted with deliberate indifference to this serious medical need.

Pegues contends these defendants delayed treatment and that this claim is distinct from

---

[3] Plaintiff makes an argument in a footnote regarding "troubling" radiology results regarding the narrowing of his spine and that it may be indicative of a more severe medical condition. Both Dr. Coe and Dr. Shah determined the x-rays showed minimal narrowing. The Court will not review this argument as Plaintiff fails to set forth a foundation for his conclusion that the radiology results are "troubling."
[4] Defendants argue Nurse Kimmel's involvement in Plaintiff's care was limited to recording and reporting his symptoms. It was a physician's decision whether or not to order a wheelchair as medically necessary.

his claim that he did not receive appropriate treatment.  In cases where prison officials delayed rather than denied medical assistance to an inmate, courts have required the plaintiff to offer "verifying medical evidence" that the delay (rather than the inmate's underlying condition) caused some degree of harm.  *Williams v. Liefer*, 491 F.3d 710, 714–15 (7th Cir. 2007).

Here, Pegues asserts that he experienced increased pain and suffering due to the absence of a wheelchair, but fails to support his assertion with any medical evidence that the delay in providing the wheelchair caused further harm.  Moreover, Dr. Coe's decisions on when to provide Pegues with a wheelchair were based on his medical judgment.  In 2014 and 2015, Dr. Coe denied requests by Pegues for a wheelchair because he found normal muscle tone and reflexes and concluded that Pegues' complaints of pain when he walked did not warrant use of a wheelchair.  After Pegues fell down the stairs in October 19, 2015, Coe provided a temporary order for a wheelchair on November 5, 2015.  On February 12, 2016, Dr. Coe provided Pegues with a wheelchair cushion to prevent skin problems.  On March 30, 2016, Dr. Coe and Pegues discussed the findings of the physical therapy consult and Dr. Coe again determined that it was not medically necessary for Pegues to be in a wheelchair.

Again, Pegues disagrees with Dr. Coe's medical judgment regarding his use of a wheelchair, but the evidence is insufficient to establish that Coe showed reckless disregard for his requests.  Therefore, Pegues has failed to produce evidence showing that the treatment provided by Dr. Coe and Nurse Kimmel was so plainly inappropriate as to permit the inference that they intentionally or recklessly disregarded his medical needs.

Plaintiff's deliberate indifference claim against Defendant Wexford is premised on its alleged maintenance of a policy discouraging referrals to outside specialists.  When a private corporation has contracted to provide essential government services, such as health care for inmates, the corporation cannot be held liable under § 1983 unless the constitutional violation

was caused by an unconstitutional policy or custom of the corporation itself. *Shields*, 746 F.3d at 789; *see also Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978). Accordingly, in order for Pegues to recover from Wexford, he must offer evidence that his injury was caused by a Wexford policy, custom, or practice of deliberate indifference to medical needs, or a series of bad acts that together raise the inference of such a policy. *Id.* at 796. He must also offer evidence showing that the policymakers were aware of the risk created by the custom or practice and failed to take appropriate steps to protect him. *Thomas v. Cook County Sheriff's Dept.*, 604 F.3d 293, 303 (7th Cir. 2009).

Defendant Wexford contends it is entitled to summary judgment because neither Dr. Coe nor Nurse Kimmel was deliberately indifferent to Pegues' medical condition and, in any event, it did not have a policy or procedure that precluded Pegues from being referred to an outside provider. Pegues argues that he has submitted evidence to show that Wexford had a constructive policy of discouraging outside referrals, especially for ailments without outward objective indicators, and that this policy deprives him of appropriate medical care. He cites to Dr. Coe's testimony and to the fact that in 2017, more than a year after this lawsuit was filed, a referral to a specialist was denied by following Wexford's Utilization Review process.

Pegues claims Dr. Coe testified that on the advice of his superior, Dr. Matticks, he regularly disregarded Pegues' subjective complaints in determining whether he should be referred to an outside specialist. However, the Court has reviewed the relevant excerpts from Dr. Coe's deposition, and finds this assertion misconstrues Dr. Coe's testimony. Dr. Coe reached out to Dr. Matticks as part of the Wexford collegial review process because Pegues' subjective complaints were inconsistent with the objective medical tests. He sought input from Dr. Matticks on how to best treat Pegues because he felt Pegues' efforts concerning his medical symptoms were "manipulative." Dr. Coe testified that Dr. Matticks' advice was to follow the

objective findings and not to over-treat Pegues.

Pegues suggests that the actions of Dr. Coe and Dr. Matticks together raise an inference of a Wexford policy to deprive him of medical treatment – specifically outside referrals. They do not. Even if Plaintiff could establish that this was Wexford's policy, there is no evidence that Wexford was aware of any risk created by such a policy. Wexford employees denied Pegues referral to an outside specialist specifically because they found no objective evidence to support such a referral. For these reasons, Pegues' deliberate indifference claim against Defendant Wexford fails.

## Americans with Disabilities Act and Rehabilitation Act

In order to prove a violation of the ADA, a plaintiff must establish that he is a "qualified individual with a disability," that he was denied "the benefits of the services, programs, or activities of a public entity" or otherwise subjected to discrimination by such an entity, and that the denial or discrimination was "by reason of" his disability. See 42 U.S.C. § 12132. A plaintiff alleging an ADA claim may also show that a defendant "refused to provide a reasonable modification." *Wisconsin Cmty. Servs., Inc. v. City of Milwaukee*, 465 F.3d 737, 753 (7th Cir. 2006).

Proving the first element requires that the plaintiff show he "meets the essential eligibility requirements" for participating in the program or service, with or without reasonable accommodations. See 42 U.S.C. § 12131(2). *Love v. Westville Corr. Ctr.*, 103 F.3d 558, 560 (7th Cir. 1996). The analysis under the RA is the same "except that the Rehabilitation Act includes as an additional element the receipt of federal funds, which all states accept for their prisons." *Jaros v. Illinois Dep't of Corr.*, 684 F.3d 667, 671 (7th Cir. 2012).

Pegues was allowed to proceed on the ADA/RA claim for denial of accommodations such as a wheelchair attendant, showers, access to gym and physical therapy. Defendant

Baldwin argues that despite the lack of medical findings and medical staff's doubts about Pegues' alleged disability, IDOC has nevertheless provided accommodations. He alleges that when the medical staff has found it medically necessary, Pegues has been provided with a wheelchair. He also asserts Pegues has had access to additional showers when requested and was approved for a permit for the ADA gym in April 2017.

Pegues acknowledges that he is now being provided a wheelchair and ADA gym access, but claims that these accommodations are not enough. He has requested a wheelchair attendant and access to additional showers, but has been denied these accommodations.

Pegues' request for additional showers does not meet the requirements for an ADA claim. Moreover, he is not being denied additional showers because of his disability; he is being denied additional showers based on institutional policies established to maintain order and security. Even if Pegues can show he has a disability, as an inmate, he is not entitled to access showers whenever he chooses.

Pegues' second ADA request is that he be provided a wheelchair attendant. However, he has failed to point to any evidence indicating that he is missing any program or service available to other offenders due to the lack of a wheelchair attendant. Simply put, the record is devoid of any evidence from which a jury could reasonably conclude that that IDOC is denying or has denied Pegues accommodations that are needed as a result of his alleged disability. Therefore, Defendant Baldwin, in his official capacity, is entitled to summary judgment on the ADA/RA claims.

## Conclusion

Defendants' Motions for Summary Judgment (Docs. 129 and 131) are **GRANTED** in their entirety. Plaintiff's claims are **DISMISSED WITH PREJUDICE**. The Clerk of Court is **DIRECTED** to enter judgment accordingly and to close the case.

**IT IS SO ORDERED.**

**DATED:  April 11, 2018**

<u>s/ Staci M. Yandle</u>
**STACI M. YANDLE**
**United States District Judge**